IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NAN WADSWORTH, MARK APANA, ELIZABETH VALDEZ KYNE, BERT VILLON and STEPHEN WEST, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| KSL GRANT WAILEA RESORT, INC.; CNL RESORT LODGING TENANT CORP.; CNL GRAND WAILEA RESORT, L.P.; MSR RESORT LODGING TENANT, LLC; HILTON HOTELS CORPORATION; WALDORF-ASTORIA MANAGEMENT, LLC; and BRE/WAILEA LLC dba GRAND WAILEA RESORT HOTEL & SPA, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civ. No. 08-00527 ACK-LEK

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

FACTUAL BACKGROUND[1]

Plaintiffs Nan Wadsworth, Elizabeth Valdez Kyne, Bert Villion, and Stephen West ("Plaintiffs") have all worked as food and beverage servers at the Grand Wailea Resort Hotel & Spa in Maui.  Second Am. Compl. ¶ 3.  Plaintiffs bring this action on behalf of themselves and a class of individuals similarly

_____

[1] The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

situated.  Id. ¶ 4.  Plaintiffs assert the class of individuals
similarly situated consists of "all individuals who are, or who
have, worked as food and beverage servers [for] the defendants
during the period of time in which the defendants have imposed a
service charge on food and beverage, but have not remitted the
entire services charge as tip income to these employees."  Id.
Plaintiffs' Second Amended Complaint alleges that the Grand
Wailea Resort Hotel & Spa ("Grand Wailea Resort" or "Hotel")
provides food and beverage service throughout the hotel,
including in its banquet department, its restaurants, and through
room service.  Id. ¶ 5.

        Plaintiffs allege that the Grand Wailea Resort has been
owned and operated by a number of different entities during the
applicable statute of limitations period, including its current
owner, Defendant MSR Reort Lodging Tenant, LLC, and operator,
Defendant BRE/Wailea, LLC, as well as prior owners and operators,
Defendants KSL Grant Wailea Resort, Inc., Waldorf=Astoria
Management LLC, CNL Grand Wailea Resort, LP, and CNL Lodging
Tenant Corp. (together, "Defendants").  Id. ¶¶ 6-8.

        Plaintiffs allege that Defendants have added a preset
service charge to customers' bills for food and beverage served
at the Hotel, but that Defendants have not remitted the total
proceeds of the service charge as tip income to the employees who
serve the food and beverages.  Id. ¶¶ 9-10.  Instead, Plaintiffs

2

allege that the Defendants have had a policy and practice of retaining for themselves a portion of these service charges (or using it to pay managers or other non-tipped employees who do not serve food and beverages), without disclosing to the Hotel's customers that the services charges are not remitted in full to the employees who serve the food and beverages.  Id. ¶¶ 11-12.

Plaintiffs assert five counts.  In Count I, Plaintiffs allege that Defendants' actions violate Hawai'i Revised Statutes ("H.R.S.") § 481B-14.  Plaintiffs allege that pursuant to H.R.S. § 481B-4, such violation constitutes an unfair method of competition or unfair and deceptive act or practice within the meaning of H.R.S. § 480-2.  In Count II, Plaintiffs allege that Defendants' conduct constitutes unlawful intentional interference with contractual and/or advantageous relations.  In Count III, Plaintiffs allege that Defendants' conduct constitutes a breach of implied contract.  In Count IV, Plaintiffs allege that Defendants have been unjustly enriched at Plaintiffs' expense under state common law.  Finally, in Count V, Plaintiffs allege that as a result of Defendants' conduct, they have been deprived of income that constitutes wages, which is actionable under H.R.S. §§ 388-6, 388-10, and 388-11.

## PROCEDURAL BACKGROUND

On November 24, 2008, a class action complaint was filed in this case.  Doc. No. 1.  On January 29, 2009, an Amended

Class Action Complaint was filed ("Amended Complaint").  Doc. No.
19.  There are a number of similar cases pending in this Court
and on January 23, 2009, Plaintiffs moved to consolidate or
alternatively for assignment of all the related cases to one
judge pursuant to Local Rule 40.2.  Doc. No. 16.  The motion to
consolidate was denied on March 19, 2009 (Doc. No. 37) and
Magistrate Judge Kobayashi's Findings and Recommendation
Regarding Assignment Pursuant to Local Rule 40.2. were adopted on
April 8, 2009 (Doc. No. 56).[2]

On July 9, 2009, this case was stayed in light of Judge
Gillmor's certification to the Hawai'i Supreme Court of a
question of law that was also important to the instant case.[3]
See Doc. No. 71.  The Hawai'i Supreme Court answered the

---

[2] In that Findings and Recommendation, Judge Kobayashi
found that reassignment to the same district judge was not
warranted, but that the cases should be reassigned to one
Magistrate Judge for more efficient case management.  See Order
Denying Plaintiffs' Motions to Consolidate Actions; and Findings
and Recommendations to Deny Alternative Requests for Assignment
Pursuant to L.R. 40.2.

[3] Judge Gillmor certified the following question: "Where
plaintiff banquet server employees allege that their employer
violated the notice provision of H.R.S. § 481B-14 by not clearly
disclosing to purchasers that a portion of a service charge was
used to pay expenses other than wages and tips of employees, and
where the plaintiff banquet server employees do not plead the
existence of competition or an effect thereon, do the plaintiff
banquet server employees have standing under H.R.S. § 480-2(e) to
bring a claim for damages against their employer?"  See Certified
Question to The Hawaii Supreme Court From the United States
District Court for the District of Hawaii in Civil No. 08-00525
HG-LEK, Doc. No. 75 in Civ. No. 08-00525, filed June 2, 2009.

certified question on March 29, 2010, in <u>Davis v. Four Seasons Hotel Ltd.</u>, 122 Hawai'i 423, 228 P.3d 303 (2010).  Accordingly, on April 16, 2010, Plaintiffs filed a motion to lift the stay and a motion to file a second amended complaint.  Doc. Nos. 73 & 74.  The Magistrate Judge granted both motions on June 22, 2010.  Doc. No. 89.  Plaintiffs then filed their Second Amended Complaint ("Second Amended Complaint") on June 28, 2010.[4/]  Doc. No. 93.

On July 20, 2010, Defendants filed a Motion to Dismiss Second Amended Complaint.  Defendants also filed a Memorandum in Support of their Motion to Dismiss (the "Motion" or "Motion to Dismiss") as well as a Declaration of Matthew Bailey and Exhibits A and B.  Doc. No. 95.  On September 3, 2010, Plaintiffs moved to continue the hearing on Defendants' Motion to Dismiss, which had been scheduled for October 12, 2010.  Doc. No. 102.  On September 8, 2010, the Court granted Plaintiffs' motion and continued the hearing to November 16, 2010, at 10 a.m.

On October 28, 2010, Plaintiffs filed a Memorandum in Opposition to Defendants' Motion to Dismiss ("Opposition").  Doc. No. 107.  Although Plaintiffs' Opposition was untimely pursuant

---

[4/] Plaintiffs also filed a Second Amended Complaint in the <u>Davis</u> case before Judge Gillmor.  Judge Gillmor ruled on a renewed motion to dismiss filed by the defendants in that case on September 30, 2010.  <u>Davis v. Four Seasons</u>, Civ. No. 08-00525 HG-LEK, Order Granting In Part and Denying in Part Defendants' Renewed Motion to Dismiss Plaintiffs' Complaint (Doc. No. 94) filed 9/30/10 (hereinafter <u>Davis</u> 9/30/10 Order).  The Court notes that there was no union and thus no collective bargaining agreement at issue in <u>Davis</u>.

to the Local Rules which require any opposition to be filed not later than twenty-one days prior to a hearing on a motion (D. Haw. Local Rule 7.4), the Court accepted Plaintiffs' tardy filing.  Doc. No. 111.  The Court also granted Defendants additional time to respond to Plaintiffs' Opposition in light of its tardiness.  Defendant's Reply was filed on November 8, 2010. Doc. No. 112.

A hearing on Defendants' Motion to Dismiss was held on November 17, 2010.[5/]

## LEGAL STANDARDS

### I.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

A court's subject matter jurisdiction may be challenged under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).  "Once the moving party [converts]

---

[5/] On November 9, 2010, the hearing that was scheduled for November 16, 2010, was continued one additional day to November 17, 2010.

the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." <u>Savage v. Glendale Union High Sch.</u>, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." <u>Trentacosta v. Frontier Pac. Aircraft Indus., Inc.</u>, 813 F.2d 1553, 1559 (9th Cir. 1987).  When ruling on a jurisdictional motion involving factual issues which also go to the merits, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." <u>Casumpang v. Int'l Longshoremen's & Warehousemen's Union</u>, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

## II.  Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") permits dismissal of a complaint that fails "to state a claim upon which relief can be granted."  Under Rule 12(b)(6), review is generally limited to the contents of the complaint.

Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996). Courts may also "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Documents whose contents are alleged in a complaint and whose authenticity are not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion to dismiss. See Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994).

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. See Sprewell, 266 F.3d at 988; Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology, 228 F.3d 1043, 1049 (9th Cir. 2000); In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996). Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. Sprewell,

8

266 F.3d at 988.

        As the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir.), cert. denied, 441 U.S. 965 (1979). The court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of a plaintiff's claims. Id.

        In summary, to survive a Rule 12(b)(6) motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (internal citations and quotations omitted). Dismissal is appropriate under Rule 12(b)(6) if the facts alleged do not state a claim that is "plausible on its face." Id. at 570. "Determining

9

whether a complaint states a plausible claim for relief
will . . . be a context-specific task that requires the reviewing
court to draw on its judicial experience and common sense."
<u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1950 (2009) (citation
omitted).  "[W]here the well-pleaded facts do not permit the
court to infer more than the mere possibility of misconduct, the
complaint has alleged - but it has not 'show[n]'- 'that the
pleader is entitled to relief.'"  <u>Id.</u> (quoting Fed. R. Civ. P.
8(a)(2)).

## <u>DISCUSSION</u>

Defendants move to dismiss Plaintiffs' Second Amended
Complaint on multiple grounds.  Principally, Defendants assert
that, under Rule 12(b)(6), Plaintiffs' Unfair Method of
Competition ("UMOC") claim (Count I) fails to state a claim upon
which relief may be granted and that all of Plaintiffs' claims
are preempted under two different federal labor law doctrines.
Defendants also assert that, under Rule 12(b)(6), Plaintiffs fail
to state a claim against certain defendants because Plaintiffs
have failed to adequately allege an employment relationship.  As
it is a jurisdictional question, the Court will address
Defendants' preemption arguments first, then their argument
regarding Plaintiffs' alleged failure to state a UMOC claim, and
finally, their argument that Plaintiffs fail to state a claim
against certain defendants.

I.   **Whether Plaintiffs' Claims Are Preempted By Federal Labor Law**

A.   **Section 301 Preemption**

Defendants argue that all of Plaintiffs' claims are preempted by Section 301 of the Labor Relations Management Act, 29 U.S.C. § 185(a) ("Section 301"), and therefore should be dismissed for lack of subject matter jurisdiction.  Motion at 25-26.   Section 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Supreme Court has explained that in enacting this statute, Congress charged federal courts with a "mandate . . . to fashion a body of federal common law to be used to address disputes arising out of labor contracts." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985).  Thus, "a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and resolved by reference to federal law.  A state rule that purports to define the meaning or scope of a term in a contract suit is therefore pre-empted by federal labor law." Lueck, 471 U.S. at 210.  However, the Supreme Court has explained that in order to give the policies behind Section 301 their proper range, the pre-emptive effect of

11

§ 301 must extend beyond suits alleging contract violations.  Id.
Therefore,

> questions relating to what the parties to a labor
> agreement agreed, and what legal consequences were
> intended to flow from breaches of that agreement, must
> be resolved by reference to uniform federal law,
> whether such questions arise in the context of a suit
> for breach of contract or in a suit alleging liability
> in tort.  Any other result would elevate form over
> substance and allow parties to evade the requirements
> of § 301 by relabeling their contract claims as claims
> for tortious breach of contract.

Id. at 211.  The Supreme Court in Leuck was careful though to
clarify that "not every dispute concerning employment, or
tangentially involving a provision of a collective-bargaining
agreement, is pre-empted by § 301 or other provisions of the
federal labor law. . . . In extending the pre-emptive effect of §
301 beyond suits for breach of contract, it would be inconsistent
with congressional intent under that section to preempt state
rules that proscribe conduct, or establish rights and
obligations, independent of a labor contract."  Id. at 212.

        The Supreme Court revisited this issue just a few years
after Leuck in Lingle v. Norge Division of Magis Chef, Inc., 486
U.S. 399 (1988).[6/]  Lingle has become a touchstone in the
analysis of § 301 preemption.  There, the Supreme Court held that
although an employee was covered by a collective bargaining

_____

        [6/] The Court observes that Plaintiffs refer to Section 301
preemption as the Lingle Doctrine.  See Opposition at 2, 32
("Plaintiffs' Statutory Claims Are Not Preempted by the Lingle
Doctrine").

agreement that provided a contractual remedy for discharge without just cause, the employee could still maintain her state-law remedy for retaliatory discharge.  See id. at 401.  The Supreme Court explained that in order to resolve the plaintiff's state law retaliatory discharge claim there was no need to interpret any term of the collective bargaining agreement.  Id. at 407.  Therefore, the Supreme Court concluded that "the state-law remedy [was] 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement."  Id. at 407.

In practice, however, the "demarcation between preempted claims and those that survive § 301's reach is not . . . a line that lends itself to analytical precision."  Cramer v. Consolidated Freightways, Inc., 255 F.3d 683, 691 (9th Cir. 2001).  Nevertheless, the Ninth Circuit has established guidelines to aid in this process based upon the Supreme Court's preemption decisions.  See Burnside v. Kiewit Pacific Corp., 491 F.3d 1053, 1060 (9th Cir. 2007).

First, a court must determine whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA.  Id. at 1059-60.  As a part of this analysis, the Court must consider the "legal character of a

13

claim, as 'independent of rights under the collective-bargaining agreement [and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." Id. at 1060 (citing Lividas v. Bradhaw, 512 U.S. 107, 123 (1994)).  Moreover, a defendant's reliance upon a CBA as an aspect of a defense is not enough to "inject[] a federal question into an action that asserts what is plainly a state-law claim." Id.

Second, even if a right exists independently of the CBA, a court must consider whether the claim is nevertheless "substantially dependent on analysis of a collective-bargaining agreement." Id. at 1059-60.  To determine whether a state law right is "substantially dependent" on the terms of a CBA, the court must examine whether a claim can be resolved by "looking to" a CBA rather than "interpreting" the CBA. Id.  In Lividas, the Supreme Court made it clear that "when the meaning of contract terms is not the subject of dispute, the bare fact that a [CBA] will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Lividas, 512 U.S. at 124.  The Ninth Circuit has also explained, as part of this analysis, if a waiver of the state law right at issue is asserted (and a waiver of that right is permissible), a court may look to a CBA to determine whether it contains a clear and unmistakable waiver of that right without triggering Section 301 preemption. See Cramer, 255 F.3d at 692.  Finally, a court may

14

look to a CBA to determine damages without triggering the need

for preemption.  See Lingle, 486 U.S. at 413 n. 12 ("A

collective-bargaining agreement may, of course, contain

information such as rate of pay . . .  that might be helpful in

determining the damages to which a worker prevailing in a state-

law suit is entitled."); Lividas, 512 U.S. at 125 ("[T]he mere

need to 'look to' the collective-bargaining agreement for damages

computation is no reason to hold the state-law claim defeated by

§ 301."); Burnside, 491 F. 3d at 1073 (citing Lividas).

    Defendants argue that all of Plaintiffs' causes of

action require interpretation of the CBA and thus are preempted

by Section 301.  Motion at 27.  Each of Plaintiffs' counts is

addressed in turn.

    1.   Count I - Unfair Methods of Competition

    Plaintiffs' first count asserts that Defendants have

violated H.R.S. § 481B-14, which provides:

> Any hotel or restaurant that applies a service charge
> for the sale of food or beverage services shall
> distribute the service charge directly to its employees
> as tip income or clearly disclose to the purchaser of
> the services that the service charge is being used to
> pay for costs or expenses other than wages and tips of
> employees.

H.R.S. § 481B-14.  Pursuant to H.R.S. § 481B-4, "[a]ny person who

violates this chapter shall be deemed to have engaged in an

unfair method of competition and unfair or deceptive acts or

practice in the conduct of any trade or commerce within the

meaning of section 480-2."  Accordingly, Plaintiffs are bringing this action under H.R.S. § 480-2(e), which permits "any person" to bring an action "based on unfair methods of competition declared unlawful by this section."

Defendants argue that this Count is preempted because the CBA specifically defines what a service charge is and addresses the allocation of a service charge between the Hotel and its employees, whereas there is "no statutory definition of 'service charge' nor is there any description of the manner in which a Hotel and its employees divide a service charge." Motion at 27-28.  Defendants further assert "[s]ince the division of service charge proceeds is governed by the CBA, the Court cannot determine whether 'service charges' have been wrongfully retained by the Hotel without reviewing the CBA.  Thus, Section 301 preempts Plaintiffs' Haw. Rev. Stat. § 481B-14 claims." Motion at 28.

The Court rejects Defendants' arguments and finds that Count I is not preempted by Section 301.  First, Defendants do not argue that this claim is based on a right conferred only by the CBA rather than an independent right conferred by state law, and Defendants barely even attempt to make any argument that the CBA needs to be interpreted in assessing this claim.  Motion at 27-28; see also Burnside, 491 F.3d at 1060.  Rather, Defendants argue that the Court would need to "review" the CBA.  Motion at

16

28.   However, Section 301 does not preempt a claim if a court
need merely to "look to" a CBA.   See e.g., Lividas, 512 U.S. at
122-24 ("[W]e were clear that when the meaning of contract terms
is not the subject of dispute, the bare fact that a collective-
bargaining agreement will be consulted in the court of state-law
litigation plainly does not require the claim to be
extinguished.").   The Ninth Circuit has also "stressed that, in
the context of § 301 complete preemption, the term 'interpret' is
defined narrowly - it means something more than 'consider,'
'refer to,' or 'apply.'"   Balcorta v. Twentieth Century-Fox Film
Corp., 208 F.3d 1102, 1108-09 (9th Cir. 2000).

        The Court is not persuaded by Defendants' assertion
that "resolution of Plaintiffs' claim requires that not only the
provisions of the CBA relating to services charges be examined
they must be interpreted and applied." Reply at 16.   Defendants
further argue that the allocation between employees and the Hotel
is governed by the CBA and that "[u]nder Heatherly, the parties'
agreement under the CBA is paramount, and there is nothing in §
481B-14 that trumps the terms of the CBA." Reply at 16 (citing
Heatherly v. Hilton Hawaiian Village Joint Venture, 78 Haw. 351,
893 P.2d 779 (1995)).   The Court finds that Heatherly cannot be
read as broadly as Defendants would like.   The Hawai'i Supreme
Court in Heatherly recognized that "parties may not do by
contract what is prohibited by statute." Heatherly, 78 Haw. at

17

355-56, 893 P.2d at 783-84.   However, the court found that "nothing in HRS chapter 387 [precluded] the Hotels from agreeing - for the sole purpose of the minimum wage law - not to treat porterage as revenue." Id.  Thus, the Hawai'i Supreme Court concluded that while Hawai'i law may have permitted the porterage fee to be considered in determining whether the state's minimum wage law was being met, the parties were permitted to agree to exclude that fee in determining minimum wage.  In essence, the parties had bargained for greater protections for the employee than those provided under the law and they had not contradicted any state statute.  Thus, Heatherly does not stand for the broad proposition that "the parties' agreement under the CBA is paramount and nothing in § 481B-14 trumps the terms of the CBA." Reply at 16.

Indeed, the parties' agreement cannot always be paramount.  As the Ninth Circuit has explained, Section 301 "does not permit parties to waive, in a collective-bargaining agreement, 'nonnegotiable state rights' conferred on individual employees." Valles v. Ivy Hill Corp., 410 F.3d 1071, 1076 (9th Cir. 2005).  Moreover, if under state law a waiver of rights is permissible, "the CBA must include clear and unmistakable language waiving the covered employee's state right for a court to even consider whether it could be given effect." Id.  A court may look to the CBA to determine if there has been such a waiver

18

without triggering preemption.  <u>See</u> <u>Cramer</u>, 255 F.3d at 692.

Here, Plaintiffs argue that application of H.R.S. § 481B-14 to the facts of this case presents a "two-part inquiry: (1) was a service charge assessed and (2) was the service charge properly disclosed to customers.  This inquiry does not require any interpretation of, or even reference to the CBA."  Opposition at 34.  If the service charge was assessed and was not disclosed to the customers, then the statute dictates that the employees are entitled to 100% of the service charge.  The Defendants have not pointed to any clear and unmistakable waiver of this right in the CBA, nor has the Court found any.  Despite the existence of H.R.S. § 481B-14, there is no reference to it in the relevant section of the CBA.

This case is similar to <u>Alderman v. 21 Club Inc.</u>, __ F. Supp. 2d __, Civ. No. 09-2418 TPG, 2010 WL 3304268 (S.D.N.Y. Aug. 20, 2010).  In that case, the plaintiffs made a claim under a New York tips statute, and the defendants argued that such a claim was preempted because of the existence of a CBA between the parties that guaranteed employees an 18% service charge.  <u>Id.</u> at *5.  The <u>Alderman</u> court explained that "the CBA guarantees gratuities in the amount of 18% of the total bill for the function.  Section 196-d guarantees to the employees whatever has been charged to provide gratuities, without reference to a specific percentage."  <u>Id.</u>  Thus, the Southern District of New

York found that because the CBA only guaranteed an 18% percent service charge, "a claim for more than 18% is not properly one under the CBA.  It is properly made under § 196-d.  The result is, and the court so holds, that the gratuities claim is not preempted by federal law."  Id. at *6.

     The Court finds that similar reasoning is applicable here.  Like in Alderman, a claim for any more than 93% of the service charge is one properly made under the statute and not the CBA.  At most, the CBA might need to be referenced in computing damages owed to the Plaintiffs, which does not require preemption.  See Lingle, 486 U.S. at 431 n.12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . .  that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled."); Lividas, 512 U.S. at 125 ("[T]he mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301."); Burnside, 491 F. 3d at 1073 (citing Lividas).

     Thus, the Court finds Plaintiffs' H.R.S. § 481B-14 claim is a statutory claim that is independent from any obligations created under the CBA.  The Court further finds that resolution of that claim does not require interpretation of the CBA and there has not been a clear and explicit waiver of the Plaintiffs' rights under H.R.S. § 481B-14 in the CBA.  Therefore,

20

the Court finds that Count I is not preempted by Section 301. However, as discussed _infra_, Section II, the Court does find that Plaintiffs fail to state a claim under H.R.S. § 480 for the alleged violation of H.R.S. § 481B-14.

      2.   <u>Count II - Intentional Interference with Contractual and/or Advantageous Relations</u>

      Plaintiffs' second count asserts that the "defendants' conduct as set forth above in failing to remit the total proceeds of service charges to food and beverage services constitutes unlawful intentional interference with contractual and/or advantageous relationships that exist between these employees and the defendants' customers under state common law."  Second Am. Compl. Count II.  Hawai'i recognizes two separate torts: (1) tortious interference with contractual relations and (2) the tort of intentional or tortious interference with prospective business advantage.  <u>Meridian Mortgage Inc. v. First Hawaiian Bank</u>, 109 Hawai'i 35, 122 P.3d 1133, 1145-46 (Haw. App. 2005); <u>Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co. Inc.</u>, 91 Hawai'i 224, 258-59, 982 P.2d 853, 887-88 (1999), <u>superceded by statute on other grounds</u>.  Among other elements, tortious interference with contractual relations requires a contract between the plaintiff and a third party and a defendant's knowledge of the contract.  <u>Meridian</u>, 91 Hawai'i at 45, 122 P.3d at 1143.  Because the Plaintiffs have not alleged the existence of a contract between themselves and customers of the Hotel, the

Court will focus on a tortious interference with prospective business advantage claim.

To state a claim for tortious interference with prospective business advantage, a plaintiff must allege: (1) the existence of a valid business relationship or a prospective advantage or expectancy that is reasonably probable of maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) purposeful intent to interfere with the relationship, advantage or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.  See Meridian Mortgage, 109 Hawai'i at 47-48, 122 P.3d at 1145-46.

Defendants argue "the Hotel has distributed service charges in accordance with the CBA's express terms.  Exhibit B. at ¶ 22.  Thus, any determination of whether the Hotel's distribution of service charges was 'unlawful' will require the Court to interpret this provision of the CBA to determine whether the Hotel had a legal right to the service charge it retained. Such consideration of the CBA is foreclosed by Section 301." Motion at 29 (citing Hernandez v. Pac. Mar. Ass'n, No. 08-55490, 2010 U.S. App. Lexis 10216, *4-*8 (9th Cir. May 19, 2010)).

The Court rejects Defendants' argument.  Again, Defendants do not appear to make any attempt to argue that this

claim is based on a right conferred only by the CBA rather than
an independent right conferred by state law.   Instead, Defendants
focus on the second part of the <u>Burnside</u> inquiry - that is, even
if a right exists independently of the CBA, resolution of the
claim is substantially dependent on an analysis of the collective
bargaining agreement such that the claim should be preempted.
<u>Burnside</u>, 491 F.3d at 1059-60.

          Although Defendants clearly plan to use the CBA as a
defense to this state law claim, such usage does not render the
state law claim dependent on the CBA.   See <u>Burnside</u>, 491 F.3d at
1060 (explaining that a defendant's reliance upon a CBA as an
aspect of a defense is not enough to "inject[] a federal question
into an action that asserts what is plainly a state-law claim");
<u>Beals v. Kiewit Pacific Co.</u>, 114 F. 3d 892, 895 (9th Cir. 1997)
(negligent misrepresentation claim not preempted by § 301 because
no construction of the CBA was necessary and none of the terms
relevant to the misrepresentation claim were subject to
conflicting meanings).   Furthermore, even if the CBA needs to be
consulted, there has been no persuasive argument that
interpretation as opposed to mere consultation would be
necessary, thus preemption is not necessary.   See <u>Cramer</u>, 255 F.
3d at 691 (citing <u>Lividas</u>, 512 U.S. at 122-24 ("[T]he bare fact
that a collective-bargaining agreement will be consulted in the
course of state-law litigation plainly does not require the claim

to be extinguished"). In this case, there does not appear to be any dispute that the terms of the CBA indicate that the Hotel may keep 7% of any service charge imposed.

Accordingly, the Court finds that Count II is not preempted by Section 301.

### 3. Count III - Implied Breach of Contract Claim

Plaintiffs' third count asserts that the

> Defendants' conduct as set forth above constitutes breach of implied contract under state common law. The defendants have breached an implied contract with the plaintiffs that they would comply with the law and distribute the total proceeds of service charges to food and beverage servers. Also the defendants have breached an implied contract with its customers that the employees would receive this money, for which the employees are third party beneficiaries.

Second Am. Compl. Count III.

To state a claim for breach of an implied contract, a plaintiff must allege the breach of "an agreement in fact," which is not expressed, but "is implied or presumed" based upon the actions of the parties. Durette v. Aloha Plastic Recycling, Inc., 105 Hawai'i 490, 504, 100 P.3d 60, 74 (2004); Kemp v. State of Hawaii Child Support Enforcement Agency, 111 Hawai'i 367, 391, 141 P.3d 1014, 1038 (2006).

Plaintiffs' implied breach of contract claim is a two part claim. First, they allege that Defendants breached an implied contract with Plaintiffs. This claim is preempted because an explicit contract exists between Plaintiffs and

24

Defendants regarding Plaintiffs' employment with Defendants - the CBA.  See Young v. Anthony's Fish Grotto, Inc., 830 F.2d 993, 997 (9th Cir. 1987) (rejecting the plaintiff's argument that her individual labor contract was independent of the CBA and that thus her contract claim was not a claim for a breach of the CBA, noting that any "independent agreement of employment [concerning that job position] could be effective only as part of the collective bargaining agreement' [and thus] the CBA controls and the contract claim is preempted").  Any consideration of whether there is an implied contract between the parties would require interpretation of the CBA to determine what terms could be implied under the CBA.  Therefore, the Plaintiffs' claim regarding an implied contract between themselves and Defendants is preempted by Section 301.  See Lueck, 471 U.S. at 215 ("[I]t is a question of federal contract interpretation whether there was an obligation under this labor contract to provide the payments in a timely manner, and, if so, whether Allis-Chalmers' conduct breached that implied contract provision."); Aramark, Civ. No. 08-cv-10700-RWZ, slip op. at *8-10 (noting in its discussion of the plaintiffs' count for breach of implied contract under state common law that "[e]ven if additional implied terms are read into the Agreement, plaintiffs' common law breach of contract claim is preempted by Section 301").

Second, Plaintiffs allege that "the defendants have

25

breached an implied contract with its customers that the
employees would receive this money, for which the employees are
third party beneficiaries." Second Am. Compl. Count III. The
Court finds that such a claim is not preempted by Section 301.[7/]
Any purported implied contract between the Defendants and their
customers would be independent of the CBA and would not require
any interpretation of terms of the CBA. Such an alleged implied
contract and a third party beneficiary right would arise under
the statute, H.R.S. § 481B-14.

Accordingly, Plaintiffs' breach of implied contract
claim is preempted by Section 301 to the extent that Plaintiffs
allege an implied contract between Plaintiffs and Defendants.
Plaintiffs' breach of implied contract claim is not, however,
preempted to the extent that they allege there is an implied
contract between Defendants and another party, to which
Plaintiffs assert that they are third-party beneficiaries.

4.   <u>Count IV - Unjust Enrichment</u>

Plaintiffs' fourth count asserts "the defendants'
conduct as set forth above constitutes unjust enrichment under
state common law." Second Am. Compl. Count IV. As this Court

---

[7/] The Court observes that Defendants have only moved to
dismiss the Second Amended Complaint for failure to state a claim
as to certain defendants and as to Count I. See Motion at 1-2;
Reply at 1-2 (explicitly acknowledging that "Defendants have not
sought dismissal of Count V for failure to state a claim under
Rule 12(b)(6)").

has previously explained:

> The Hawaii Supreme Court [has] explored the general
> parameters of an unjust enrichment claim, recognizing that
> limited jurisprudence involving such a claim existed in
> Hawaii.  See Durette v. Aloha Plastic Recycling, Inc., 105
> Hawai'i 490, 502, 100 P.3d 60 (2004).  "One who receives a
> benefit is of course enriched, and he would be unjustly
> enriched if its retention would be unjust."  Id. at 502, 100
> P.3d 60 (citing Restatement (First) of Restitution § 1
> comment a (1937)).  As Professor George E. Palmer stated,
> "[u]njust enrichment is an indefinable idea in the same way
> justice is indefinable.  But many of the meanings of justice
> are derived from a sense of injustice, and this is true of
> restitution since attention is centered on the prevention of
> injustice.  Not all injustice but rather one special
> variety: the unjust enrichment of one person at the expense
> of another."  Durette, 105 Hawai'i at 503 n. 9, 100 P.3d 60
> (citing 1 G. Palmer, The Law of Restitution § 1.1 (1978)
> (internal citation omitted)).  It follows that the person
> who is unjustly enriched is required to make restitution to
> the other.  Durette, 105 Hawai'i at 502, 100 P.3d 60.  While
> unjust enrichment may be a "broad and imprecise term," the
> court emphasized that in deciding when to apply restitution,
> the prevention of injustice guides.  Id. at 502-03, 100 P.3d
> 60 (citing A. Denning, The Changing Law 65 (1953)).

Television Events & Marketing, Inc. v. Amcon Distrib. Co., 488 F.

Supp. 2d 1071, 1078 (D. Haw. 2006).  Thus, the Court explained

there are two required elements of an unjust enrichment claim.

First, a plaintiff must show that he or she has conferred a

benefit upon the defendant and second, that the retention of that

benefit was unjust.  Id.

        The Court finds that, as with other counts, this claim

is based upon H.R.S. § 481B-14 and, although the CBA may be

referenced in Defendants' defense, no interpretation of the CBA

is required, and thus this claim is not preempted by Section 301.

See Burnside, 491 F.3d at 1060 (explaining that a defendant's

reliance upon a CBA as an aspect of a defense is not enough to "inject[] a federal question into an action that asserts what is plainly a state-law claim"). As noted earlier, there does not appear to be any dispute that the CBA provides that the Hotel may keep 7% of the service charge. Thus, this provision may be raised as a defense without the need for any interpretation of the CBA.

     5.   <u>Count V - Unpaid Wages, Haw. Rev. Stat. §§ 388-6, 388-10, and 388-11</u>

     In their fifth count, Plaintiffs allege

> As a result of the defendants unlawful failure to remit the entire proceeds of food and beverage service charges to food and beverage servers, the plaintiffs have been deprived of income which constitutes wages, which is actionable under Hawaii Revised Statutes Section 388-6, 10, 11. Pursuant to those statutes, the plaintiffs hereby bring a claim for unpaid wages, including liquidated damages, interest, and attorneys' fees.

Second Am. Compl. Count V.

     H.R.S. § 388-6 provides, <u>inter</u> <u>alia</u>, that, subject to certain exceptions "[n]o employer may deduct, retain, or otherwise require to be paid, any part or portion of any compensation earned by any employee. . . ." H.R.S. § 388-6. One of those exceptions applies if an employer obtains a written authorization from that employee. Pursuant to H.R.S. § 388-11, an employee may maintain an action to recover unpaid wages. H.R.S. § 388-1 defines wages and explains that "for the purposes of section 388-6, 'wages' shall include tips or gratuities of any

28

kind." H.R.S. § 388-1.

Plaintiffs assert that "as recognized by Judge Gillmor in her recent Order in the Davis case, Plaintiffs may enforce the substantive protections created by HRS 481B-14 by utilizing HRS §§ 388-6, 10 and 11." Opposition at 6, 8. The Court agrees with this to the extent that Plaintiffs may have a claim under H.R.S. § 388 for unpaid compensation, but not to any extent that Plaintiffs are seeking to avoid the requirements of H.R.S. § 480-2(e) and yet obtain damages under that statute. As Judge Gillmor explained:

> Plaintiffs argue that: (1) H.R.S. § 481B-14 requires an employer to distribute service charges to employees as 'tip income' unless the employer discloses its retention of [a part or all] of the service charge to customers; (2) this 'tip income' falls under the definition of 'wages' according to H.R.S. § 388-1; and (3) since the Defendants have failed to make the required disclosures, they have retained 'tip income' in violation of H.R.S. § 388-6.

Davis 9/30/10 Order at *37-38. Put another way, because for purposes of H.R.S. § 388, the statutory definition of wages includes tips, and because pursuant to H.R.S. § 481B-14 a service charge received by the employers without notice to the customers is deemed a tip, the employer holds that tip in trust for the employees as a conduit. Therefore, the employees have a claim against the employer for compensation that has been withheld.

The Court finds that Plaintiffs' H.R.S. Chapter 388 claim is not preempted. This case is most similar to the Lividas

and _Burnside_ cases.  In _Lividas_, the Supreme Court found that a

California law, which required employers to pay all wages due

immediately upon an employee's discharge, imposed a penalty for

refusal to pay, and precluded any private contractual waiver of

those "minimum labor standards," was not preempted by Section

301.  See _Lividas_ 512 U.S. at 110, 123-125.  In _Burnside_,

employees brought a claim that they were entitled to compensation

for travel to and from worksites, and the Ninth Circuit held that

"because the right to be compensated for employer-mandated travel

exists as a matter of state law, independent of the CBAs, on this

initial basis at least the employees' claims are not preempted."

491 F.3d at 1061.  The Ninth Circuit also concluded that after

examining the relevant CBA provisions in _Burnside_, the employees

claims could be resolved by "at-most-merely 'looking to' the

CBAs" and therefore the claims were not preempted.  _Id._ at 1071.

     This case is also distinguishable from _Madison v. St._

_Francis Med. Ctr._, Civ. Nos. 92-00553 DAE & 92-00554 DAE, 1992

U.S. Dist. Lexis 21733, *11 (D. Haw. Dec. 23, 1992), which is

cited by the Defendants.  As noted earlier, an employer may be in

violation of H.R.S. § 388-6 if it withholds compensation without

the employee's written permission.  In _Madison_, the court

determined that an H.R.S. § 388 claim was preempted because it

required analysis of a CBA.  There, the plaintiff had signed an

agreement that allowed recovery through payroll deduction of a

prorated portion of a relocation allowance, except where the employment was "terminated for reasons other than misconduct or violation of the House Rules." <u>Id.</u> at 10.  Thus, the issue of whether the plaintiff had consented to the deduction turned on whether or not he was terminated for misconduct or a violation of the employer's rules, which the court had previously determined required an interpretation of the CBA.[8]  By contrast, whether or not the Defendants have improperly withheld compensation from the Plaintiffs turns on a statutory definition of tip income and whether or not the Defendants failed to give notice as provided in H.R.S. § 481B-14.  Accordingly, there is no need to even look to, much less interpret the CBA.

This case is similarly distinguishable from <u>Aramark</u> in which the court found that certain of the plaintiffs' claims were preempted.  In <u>Aramark</u>, the court found that the plaintiffs' claim under Mass. Gen. Laws ch. 151 § 1A, which requires employees to be paid at least one and one-half times their regular rate of compensation for any hours worked in excess of 40 hours per week, was preempted.  <u>Aramark</u>, Civ. No. 08-10700-RWZ,

---

[8] Moreover, <u>Madison</u> was decided prior to the Ninth Circuit's clarification of the Section 301 preemption doctrine in <u>Cramer v. Consolidated Freightways, Inc.</u>, 255 F.3d 683 (9th Cir. 2001), which explained that some prior Ninth Circuit cases had gone too far in suggesting that "the preemptive force of § 301 was so strong that preemption must occur simply because the state right in question 'is a properly negotiable subject for collective bargaining.'"  <u>Id.</u> at 692-93.

slip op. at *5.  The court there found that there were a variety of pay rate provisions which required the CBA be consulted and interpreted.  Here there are no such complications.  As the Plaintiffs argue, H.R.S. § 481B-14 requires an employer to distribute service charges to employees as 'tip income' unless the employer discloses its retention of all or a part of that service charge to its customers.  Thus, the Plaintiffs argue this tip income falls under the definition of wages in H.R.S. § 388-1, and, therefore, if Defendants have failed to make the required disclosures and have failed to distribute 100% of the service charge, they have retained tip income.  There is no need to consult or interpret the CBA.

Furthermore, the Court observes that H.R.S. § 388-8 specifies that "[e]xcept as provided in section 388-11, no provision of this chapter may in any way be contravened or set aside by private agreement."  H.R.S. § 388-8.  However, Plaintiffs seek to recover for a violation of H.R.S. § 388-6 which provides "[n]o employer may deduct, retain, or otherwise require to be paid, any part or any portion of any compensation earned by any employee except where required by federal or state statute or by court process or when such deductions or retentions are authorized in writing by the employee . . . ."  H.R.S. § 388-6.  As the Ninth Circuit has explained, Section 301 "does not permit parties to waive, in a collective-bargaining agreement,

32

'nonnegotiable state rights' conferred on individual employees."
Valles v. Ivy Hill Corp., 410 F.3d 1071, 1076 (9th Cir. 2005).
Moreover, if under state law a waiver of rights is permissible,
"the CBA must include clear and unmistakable language waiving the
covered employee's state right for a court to even consider
whether it could be given effect." Id. A court may look to the
CBA to determine if there has been such a waiver without
triggering preemption. See Cramer, 255 F.3d at 692.

Despite the language in H.R.S. § 388-8, H.R.S. § 388-6
(which is the specific section that Plaintiffs are relying upon)
appears to contain a partial waiver provision. Therefore, the
Court must look to whether there has been a waiver here.
Defendants have not come forth with any evidence that there has
been any clear and unmistakable waiver in the CBA as they are
required to if they seek to assert a party has waived a state-law
right. The Court notes that this case differs from Heatherly
because Heatherly involved a potential waiver of a state law
right by the Hotel, and not the employees. Moreover, Heatherly
was being reviewed after a grant of summary judgment. See
Heatherly, 78 Haw. at 355-56, 893 P.2d at 783-84.

Accordingly, Plaintiffs' Count V is not preempted.

6.   Summary Regarding Section 301 Preemption

As discussed in greater detail above, the Court finds
that only one portion of Count III (Plaintiffs' claim alleging a

33

breach of an implied contract between Plaintiffs and Defendants) is preempted by Section 301.  The remainder of Plaintiffs' claims are not preempted because they exist independently of the CBA and do not require interpretation of the CBA.  Because Plaintiffs' claims are not brought under the CBA, but rather under state law, they are not subject to the six-month statute of limitations for breach of contract under Section 301.  <u>See</u> 29 U.S.C. § 160(b).

Furthermore, even were the Court to construe the portion of Count III which is preempted as alleging a breach of a collective bargaining agreement under Section 301, the Court would find that Plaintiffs have failed to exhaust the grievance procedures under the CBA and their claims are untimely.  <u>See</u> <u>United Paperworkers Int'l Union AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 37 (1987) ("The courts have jurisdiction to enforce collective bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute."); 29 U.S.C. § 160(b) (providing a six-month statute of limitations); <u>DelCostello v. Int'l Brotherhood of Teamsters</u>, 462 U.S. 151, 169 (1983).  The CBA here provides for a grievance procedure.  <u>See</u> Decl. of Matthew Bailey, Ex. A, section 27 ("When any employee or the Union believes that Hotel has violated the express terms of this Agreement and that by reason of such

violation rights have been adversely affected, the employee or the Union must follow the steps set forth below in presenting the grievance for a determination of the merits thereof."); <u>see also</u> Decl. of Matthew Bailey, Ex. B. at ¶ 18.  If the parties are unable to resolve the grievance, then it is submitted to arbitration.  <u>Id.</u>  Because Plaintiffs failed to exhaust these contractually mandated procedures, judicial relief for breach of the CBA is precluded.  <u>See</u> <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 985 (9th Cir. 2007).

### B.  <u>Machinists</u> Preemption

The Defendants also argue that H.R.S. § 481B-14 is preempted by the NLRA pursuant to the Supreme Court's <u>Machinists</u> decision.  Motion at 34.  The Defendants assert that in <u>Lodge 76, Int'l Ass'n of Machinists v. Wis. Employment Relation Comm'n</u>, 427 U.S. 132, 140-41 (1976) ("<u>Machinists</u>"), the U.S. Supreme Court described the circumstances in which the NLRA will preempt an otherwise valid state law.  Under <u>Machinists</u>, state activity may be restricted "on the theory that pre-emption is necessary to further Congress['s] intent that 'the conduct involved be unregulated because [it should be] left to be controlled by the free play of economic forces.'"  <u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1, 19-20 (1987) (second alteration in original) (internal quotations omitted) (quoting <u>Machinists</u>, 427 U.S. at 140).

35

Plaintiffs assert that "Machinists preemption prohibits states from imposing restrictions on labor and management's weapons of self-help that were left unregulated in the NLRA because Congress intended for 'tactical bargaining decisions and conduct to be controlled by the free play of economic forces.'" Opposition at 23 (citing Associated Builders and Contractors of Southern California, Inc., 256 F.3d 979, 987 (9th Cir. 2004)). Plaintiffs assert that where the statutes at issue (H.R.S. §§ 388-6 and 481B-14) are laws of general applicability which create a minimum standard related to service charges for the entire hotel and restaurant industry, this doctrine is inapplicable.[9/]

The Court agrees with Plaintiffs that Machinists preemption is inapplicable here.  As the Supreme Court in Metropolitan Life Insurance Company v. Commonwealth of Massachusetts, 471 U.S. 724 (1985) stated in discussing Machinists preemption:

> [T]here is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization.  To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety.  The States traditionally have had great latitude under their police powers to legislate as "'to the protection of the lives, limbs, health, comfort, and quiet of all

---

[9/] The Court observes that Defendants' Motion only asserts that Machinists preemption applies to H.R.S. § 481B-14.

persons.'" <u>Slaughter-House Cases</u>, 16 Wall. 36, 62, 21
L.Ed. 394 (1873), quoting <u>Thorpe v. Rutland &
Burlington R. Co.</u>, 27 Vt. 140, 149 (1855). "States
possess broad authority under their police powers to
regulate the employment relationship to protect workers
within the State. Child labor laws, minimum and other
wage laws, laws affecting occupational health and
safety ... are only a few examples." <u>DeCanas v. Bica</u>,
424 U.S. 351, 356, 96 S.Ct. 933, 937, 47 L.Ed.2d 43
(1976).  State laws requiring that employers contribute
to unemployment and workmen's compensation funds, laws
prescribing mandatory state holidays, and those
dictating payment to employees for time spent at the
polls or on jury duty all have withstood scrutiny.
<u>See, e.g.</u>, <u>Day-Brite Lighting, Inc. v. Missouri</u>, 342
U.S. 421, 72 S.Ct. 405, 96 L.Ed 469 (1952).

<u>Met. Life</u>, 471 U.S. at 756.  The Supreme Court further recognized

"that it 'cannot declare pre-empted all local regulation that

touches or concerns in any way the complex interrelationships

between employees, employers, and unions; obviously, much of this

is left to the States.'"  <u>Id.</u> at 756-57 (internal citation

omitted).

H.R.S. § 481B-14 is not the type of statute that the

<u>Machinists</u> doctrine is intended to preempt as it does not present

the types of concerns enunciated in <u>Machinists</u>.  In <u>Machinists</u>,

the issue was whether a state labor relations board could grant

an employer covered by the NLRA an order enjoining a union and

its members from continuing to refuse to work overtime pursuant

to a union policy to put economic pressure on the employer in

negotiations for renewal of an expired collective bargaining

agreement.  <u>See Machinists</u>, 427 U.S. at 134.  Thus, in

<u>Machinists</u>, the Court found that the "Act's processes would be

37

frustrated . . . were the State's ruling permitted to stand."

Id. at 148.   The Supreme Court found that the State's ruling

would alter the substantive aspects of the bargaining process

that Congress had sought to regulate.   However, in considering

Machinists preemption, the Supreme Court has explained that

minimum state labor standards do not present the same types of

concerns that warrant preemption, because they do not "encourage

or discourage employees in the promotion of their interests

collectively," which are the subject of federal regulation under

the NLRA.   Metro. Life, 471 U.S. at 755.[10/]

_____

    [10/] The Supreme Court in Metro. Life explained:
        Minimum state labor standards affect union and
    nonunion employees equally, and neither encourage nor
    discourage the collective-bargaining processes that are
    the subject of the NLRA.   Nor do they have any but the
    most indirect effect on the right of self-organization
    established in the Act.   Unlike the NLRA, mandated-
    benefit laws are not laws designed to encourage or
    discourage employees in the promotion of their
    interests collectively; rather, they are in part
    "designed to give specific minimum protections to
    individual workers and to ensure that each employee
    covered by the Act would receive" the mandated health
    insurance coverage. Barrentine, 450 U.S. at 739, 101
    S.Ct. at 1444 (emphasis in original).   Nor do these
    laws even inadvertently affect these interests
    implicated in the NLRA. Rather, they are minimum
    standards "independent of the collective-bargaining
    process [that] devolve on [employees] as individual
    workers, not as members of a collective organization."
    Id. at 745, 101 S.Ct. at 1447.
        It would further few of the purposes of the Act to
    allow unions and employers to bargain for terms of
    employment that state law forbids employers to
    establish unilaterally.
Metro. Life, 471 U.S. at 755.

Hawaii's statute at issue here has no comparable effect on the bargaining process.  Defendants assert that the statute "is a consumer protection statute with a penalty on employers" and that it is the "penalty" provision "which runs afoul of Machinists preemption."  Reply at 11-12.  The Court does not agree.  The Court finds that H.R.S. § 481B-14 provides a minimum protection for employees as well as consumer protection.  The reality is that it informs consumers in order to protect employees' tips.

The Hawai'i Supreme Court in Davis examined and explained the legislative history of H.R.S. § 481B-14 in great detail.  In its first formation, the bill proposed would have, inter alia, added a definition for "tips" in H.R.S. § 387-1 that would include any service charges imposed by the employer, and amended H.R.S. § 388-6 to prohibit employers from withholding tips from employees.  See Davis, 122 Hawai'i at 433, 228 P.3d at 313.  The House Committee on Labor and Public Employment indicated the bill's original purpose was to "strengthen Hawai'i's wage and hour law to protect employees who receive or may receive tips or gratuities from having these amounts withheld or credited to their employers."  Id. (citing H. Stand. Comm. Rep. No. 479-00, in 2000 House Journal, at 1155).  Because of concerns that the bill as it had been drafted would cause confusion, the bill was amended such that the original section

39

was deleted and a new section that would eventually become H.R.S.
§ 481B-14 was drafted.  Id.  As the Davis Court highlighted, the
Senate Committee on Commerce and Consumer Protection recommended
adoption of the modified bill, noting

> Your Committee finds that it is generally
> understood that service charges applied to the sale of
> food and beverages by hotels and restaurants are levied
> in lieu of a voluntary gratuity, and are distributed to
> the employees providing the service.  Therefore, most
> consumers do not tip for services over and above the
> amounts they pay as a service charge.
> Your Committee further finds that, contrary to the
> above understanding, moneys collected as service
> charges are not always distributed to the employees as
> gratuities and are sometimes used to pay the employer's
> administrative costs.  Therefore, the employee does not
> receive the money intended as a gratuity by the
> customer, and the customer is misled into believing
> that the employee has been rewarded for providing good
> service.

Davis, 122 Hawai'i at 313, 228 P.3d at 433-34 (quoting S. Stand.
Comm. Rep. No. 3077, in 2000 Senate Journal, at 1286-87 (emphasis
added by the Davis Court)).  Thus, the Davis Court concluded that
the legislature was concerned that when a hotel or restaurant
withholds a service charge without disclosing that to consumers,
both "employees and consumers can be negatively impacted."  Id.

Defendants also argue that because this statute applies
only to the hotel and restaurant industry, it is not a statute of
general applicability and therefore should be found to be
preempted.  As discussed above, the statute provides a minimum
protection for employees as well as consumer protection.
Moreover, a minimum protection statute may be targeted toward

40

certain workers.  In Dillingham Const. N.A., Inc. v. County of
Sonoma, Division of Labor Standards, 190 F.3d 1034 (9th Cir.
1999) the Ninth Circuit indicated that just because a statute may
only be applicable to a particular industry, does not mean that
it is not one of general applicability and thus should be
preempted.  See id. at 1038-40; see also Associated Builders, 356
F. 3d at 990 ("we have  . . . explained on several occasions that
the NLRA does not authorize us to pre-empt minimum labor
standards simply because they are applicable only to particular
workers in a particular industry); Emeryville, 2006 WL 2739309 at
*12-*13 (rejecting the argument that a statute was preempted by
Machinists because it targeted four hotels and interfered with
their ability to bargain with employees and instead finding that
the statute imposed a minimum wage regulation that was not
preempted).  In light of the foregoing Ninth Circuit precedent,
Defendants reliance on 520 South Michigan Avenue Associates, Ltd.
v. Shannon, 549 F.3d 1119 (7th Cir. 2009) is unavailing for a
number of reasons.  There, the Seventh Circuit relied heavily
upon the Ninth Circuit's decision in Chamber of Commerce v.
Bragdon, 64 F.3d 497 (9th Cir. 1995), which found an ordinance
that targeted particular workers in a particular industry was
preempted.  As the Ninth Circuit has subsequently explained:

> Bragdon must be interpreted in the context of Supreme
> Court authority and our other, more recent, rulings on
> NLRA preemption. While Bragdon emphasized that the
> Contra Costa County ordinance "targets particular

41

workers in a particular industry," id. at 504, we have
since explained on several occasions that the NLRA does
not authorize us to pre-empt minimum labor standards
simply because they are applicable only to particular
workers in a particular industry. Dillingham II, 190
F.3d at 1034 (upholding minimum standards that applied
only to apprentices in the skilled trades); National
Broadcasting, 70 F.3d at 71-73 (holding that a
California regulation that applied only to broadcast
employees was not preempted); Viceroy Gold Corp. v.
Aubry, 75 F.3d 482 (9th Cir. 1996) (holding that a
regulation that applied only to miners was not
preempted). It is now clear in this Circuit that state
substantive labor standards, including minimum wages,
are not invalid simply because they apply to particular
trades, professions, or job classifications rather than
to the entire labor market.

Associated Builders, 356 F. 3d at 990.  Moreover, the

circumstances under which the law at issue in Shannon was passed

and the specific details of the law indicate that the law had a

much greater effect on the collective bargaining process than the

statute at issue here.  In Shannon, during a labor dispute

between an employer and a union, the Illinois legislature passed

a law that applied only to one occupation in one industry in one

county.  Shannon, 549 F.3d at 1121, 1131.  In considering other

cases that had found minimum labor standards that apply only to

particular occupations, industries, or categories of employers

were not preempted, the Seventh Circuit emphasized that the

Illinois statute was limited not just by trade but also by

location.  Id. at 1131 ("Unlike these cases . . . the [statute]

is not just limited by trade –it is also limited by location; the

[statute] is a state statute that applies only in one county in

42

Illinois - Cook county.  That fact distinguishes this case from the series of cases cited by Appellees, including Nunn; the [statute] is not just limited to a particular trade, profession, or job classification; it is also a state statute limited to only one of Illinois' 102 counties.").   The statute at issue here is not so narrow; it applies to any hotel or restaurant in the entire state and it was not passed during a labor dispute.

Accordingly, for the foregoing reasons, the Court finds that H.R.S. § 481B-14 is not preempted by the Machinists doctrine.

## II. Whether Plaintiffs Fail to Adequately Allege a UMOC Claim

As discussed supra, Plaintiffs assert that Defendants have violated H.R.S. § 481B-14, which provides:

> Any hotel or restaurant that applies a service charge for the sale of food or beverage services shall distribute the service charge directly to its employees as tip income or clearly disclose to the purchaser of the services that the service charge is being used to pay for costs or expenses other than wages and tips of employees.

H.R.S. § 481B-14.  Pursuant to H.R.S. § 481B-4, "[a]ny person who violates this chapter shall be deemed to have engaged in an unfair method of competition and unfair or deceptive acts or practice in the conduct of any trade or commerce within the meaning of section 480-2."  Accordingly, Plaintiffs are bringing this action under H.R.S. § 480-2(e), which permits "any person" to bring an action "based on unfair methods of competition

43

declared unlawful by this section."

Defendants argue that Plaintiffs' Second Amended Complaint does not state a claim for an unfair method of competition because it fails to allege any competition that gives rise to an antitrust injury.  In opposition, Plaintiffs argue, inter alia, that they do not have to plead an antitrust injury as defined by federal law.

A.  **The Hawai'i Supreme Court's Decision in Davis v. Four Seasons Hotel Ltd., 122 Hawai'i 423, 228 P.3d 303 (2010)**

The Hawai'i Supreme Court's opinion in Davis v. Four Seasons Hotel Ltd., 122 Hawai'i 423, 228 P.3d 303 (2010) is extremely instructive here, although both parties have differing interpretations of its impact.  As noted earlier, Davis is one of several similar cases filed by Plaintiffs' counsel in this district (civil no. 08-00525 HG-LEK).  In Davis, the Hawai'i Supreme Court answered the certified question:

> Where plaintiff banquet server employees allege that their employer violated the notice provision of H.R.S. § 481B-14 by not clearly disclosing to purchasers that a portion of a service charge was used to pay expenses other than wages and tips of employees, and where the plaintiff banquet server employees do not plead the existence of competition or an effect thereon, do the plaintiff banquet server employees have standing under H.R.S. § 480-2(e) to bring a claim for damages against their employer?

Davis, 122 Hawai'i at 425, 228 P.3d at 305.  The Hawai'i Supreme Court concluded that the plaintiff banquet servers had standing, but that "based on the allegations contained in the Employees'

44

Amended Complaint, Employees [plaintiffs] have not sufficiently

alleged the 'nature of the competition' to bring a claim for

damages against Four Seasons under HRS §§ 480-2(e) and 480-13(a)

for a violation of HRS § 481B-14." Id. The claims set forth in

the Amended Complaint that were analyzed by the Hawai'i Supreme

Court are virtually identical to the claims in this case,

although Plaintiffs have now added three paragraphs to the Second

Amended Complaint in an attempt to address the Hawaii Supreme

Court's ruling in Davis.

In Davis, the Hawai'i Supreme Court explained that in

order to state a cause of action pursuant to H.R.S. § 480-2(e)

and recover money damages, a plaintiff must meet the requirements

of H.R.S. § 480-13. Davis, 122 Hawai'i at 434, 228 P.3d at 314.

The Hawaii Supreme Court then noted that there are three

essential elements for recovery under H.R.S. § 480-13: (1) a

violation of H.R.S. Chapter 480; (2) which causes injury to the

plaintiffs' business or property; and (3) proof of the amount of

damages. Davis, 122 Hawai'i at 435, 228 P.3d at 315; Haw. Med.

Ass'n v. Haw. Med. Serv. Ass'n, 113 Hawai'i 77, 114, 148 P.3d

1179, 1216 (2006) ("HMA").

In Davis, the Hawai'i Supreme Court examined its prior

decision in HMA in great detail. The Hawai'i Supreme Court

explained that in HMA it had determined that a plaintiff may

bring claims of unfair methods of competition based on conduct

that would also support claims of unfair or deceptive acts or
practices, but that in doing so, the nature of the competition
must be sufficiently alleged in the complaint.  Davis, 112 Haw.
at 435, 228 P.3d at 315.  The Hawai'i Supreme Court further
elaborated that "the existence of the competition is what
distinguishes a claim of unfair or deceptive acts or practices
from a claim of unfair methods of competition."  Davis, 122 Haw.
at 437 n.26, 228 P. 3d at 317 n.26 (quoting HMA, 113 Haw. at 112,
148 P.3d at 1214).

        In HMA, the Hawai'i Supreme Court held that HMA had
sufficiently alleged the "nature of the competition" by, for
example, alleging in its complaint that:

> 11. . . . [HMSA's] conduct has adversely impacted, and
> continues to adversely impact, members of [HMSA's]
> plans by, among other things: (a) imposing financial
> hardships on, and in some cases threatening the
> continued viability of, the medical practices run by
> [the plaintiffs]; (b) threatening the continuity of
> care provided to patients by [the plaintiffs], as
> required by sound medical judgment; (c) requiring [the
> plaintiffs] to expend considerable resources seeking
> reimbursement that could otherwise be available to
> provide enhanced healthcare services to [HMSA's] plan
> members; (d) making it more costly and difficult for
> [the plaintiffs] to maintain and enhance the
> availability and quality of care that all patients
> receive; and (e) increasing the costs of rendering
> healthcare services in Hawaii as a result of the
> additional costs incurred and considerable effort
> expended by HMA members in seeking reimbursement from
> HMSA for services rendered . . . .
> . . .
> 26. HMSA dominates the enrollee market in Hawaii with
> over 65% of Hawaii's population enrolled in one of
> HMSA's plans. In this regard, HMSA is the largest
> provider of fee-for-service insurance in the State with

46

> more than 90% of the market and is the second largest
> HMO provider in the State. Similarly, HMSA dominates
> the physician market, with approximately 90% of
> Hawaii's physicians participating in HMSA's networks.
> 27. It is through such market dominance that HMSA is
> able to dictate the terms and amount of reimbursement
> HMA physicians will receive.

Davis, 122 Hawai'i at 436 n.24, 228 p.3d at 316 n.24 (citing HMA,

113 Hawai'i at 112, 148 P.3d at 1214) (brackets in original)

(emphasis omitted).

In contrast to the allegations in HMA, the Hawai'i

Supreme Court further explained in Davis that "even when viewed

in a light most favorable to the Employees [plaintiffs], the

Amended Complaint clearly does not contain any allegations

concerning the nature of the competition.  However, Employees are

required to allege how Four Season' conduct will negatively

affect competition in order to recover on an unfair methods of

competition claim."  Davis, 122 Hawaii at 437-38, 228 P.3d at

317-318.

B.    The Allegations of the Second Amended Complaint

Defendants assert that despite Plaintiffs' repeated use

of the term "competitive" in the Second Amended Complaint,

Plaintiffs do not allege any facts identifying the nature of the

alleged competition affected or an injury to competition.  Motion

at 12.  The paragraphs that Plaintiffs have added to the Second

Amended Complaint are paragraphs 14-16.  Paragraph 14 alleges

that Defendants' failure to either disclose that the entire

service charge is not remitted to its employees or to remit it
"has an unlawful competition reducing effect upon the hotel and
restaurant industry."  Plaintiffs further allege that this
nondisclosure to the customers allows the Defendants to "gain a
competitive advantage over hotels and restaurants" that either
make the required disclosure or remit the [entire] service charge
to their servers.  Plaintiffs allege that Defendants have gained
this unfair competitive advantage over competitor hotels that
comply because, by retaining a portion of the service charge,
"the defendants are able to reduce the published cost of their
food and beverages by improperly profiting from the imposition of
a service charge that their customers would believe is used in
full to pay [the] gratuity."  Second Am. Compl. ¶ 14.

Paragraph 15 alleges that Defendants "are
competing with plaintiffs for the amount of money customers are
willing to pay for food and beverage service" and "[b]y not
disclosing to customers that service charges are not paid in full
to the wait staff employees, the defendants are gaining an
improper competitive advantage over plaintiffs" with respect to
the amount of the gratuity that customers are willing to pay.
Second Am. Compl. ¶ 15.

Paragraph 16 alleges that the Defendants' failure to
remit the entire service charge to its employees as tip income
has resulted in a loss of tip income for Plaintiffs and is

"inextricably intertwined" with the Plaintiffs' injury because: (1) Plaintiffs have not received the total proceeds of the service charge, which they claim is legally their tip income; and (2) Plaintiffs have not received tips that customers would otherwise have left if the customers were told that the Plaintiffs did not get to keep the entire service charge.  Second Am. Compl. ¶ 16.

C.   **Analysis**

The issue that must be resolved for purposes of Defendants' Motion to Dismiss the UMOC claim for failure to state a claim is whether Plaintiffs have adequately pled the "nature of the competition" as required by <u>Davis</u>.   The Defendants assert that they have not and that this requirement is akin to the federal requirement of an "antitrust injury" for standing. Plaintiffs, in contrast, assert that they are not required to plead an antitrust injury as required by federal law.  Opposition at 12 (Section C "Plaintiffs Do Not Have to Plead an Antitrust Injury, as Defined by Federal Law.").

First, the Court notes that the Defendants are not, as Plaintiffs appear to believe, trying to "strip the 'deeming' language in [H.R.S. 481B-4] of all meaning."[11/]  Opposition at 11.

_____

[11/] As noted earlier, H.R.S. § 481B-4 declares "Any person who violates this chapter shall be deemed to have engaged in an unfair method of competition or deceptive act or practice in the conduct of any trade or commerce within the meaning of section

(continued...)

49

The Hawai'i Supreme Court has already rejected Plaintiffs'
argument regarding the deeming language.  In <u>Davis</u>, the Court
explained:

> Employees argue that "since § 481B-4 'deems' a
> violation of [§ 481B-14] to be an 'unfair method of
> competition' under § 480-2, this Court should not
> require further proof that such a violation is in fact
> an [unfair method of competition]." Citing to this
> court's previous holding in <u>Ai</u>, Amicus Curiae Rossetto
> similarly contends that the legislature, "by 'deeming'
> a violation of Section 481B-14, through the operation
> of Section 481B-4, to be a per se [unfair method of
> competition] has found the necessary element of
> 'competition' by its legislative action."  For the
> following reasons, these arguments confuse the
> requirements necessary to bring an unfair methods of
> competition claim under HRS § 480-2(e).

<u>Davis</u>, 122 Hawai'i at 438, 228 P.3d at 318.  The Hawai'i Supreme
Court established that the requirement that the plaintiff allege
the "nature of the competition" in an unfair methods of
competition claim is distinct from the requirement that a
defendant's conduct constitutes an unfair method of competition.
<u>Id.</u>  The court detailed that the requirement that a defendant's
conduct constitutes an unfair method of competition stems from
H.R.S. 480-2(a), which provides that unfair methods of
competition are declared to be unlawful; whereas in contrast, the
requirement that a "plaintiff allege that he or she was harmed <u>as
a result</u> of actions of the defendant that negatively affect
competition is derived from H.R.S. § 480-13(a)'s language that

---

[11]/(...continued)
480-2."

'any person who is injured in the person's business or property

by reason of anything forbidden or declared unlawful by this

chapter . . . [m]ay sue for damages." Id., 122 Hawai'i at 438-

39, 228 P.3d at 318-19 (emphasis and alteration in original).  It

is the requirement derived from H.R.S. 480-13(a) that Defendants'

focus on.  The Davis Court further explained:

> Applying Ai's reasoning here, by "deeming" a violation
> of § 481B-14 to be an unfair method of competition, the
> legislature "predetermine[d]" that violations of HRS
> Chapter 481B would constitute per se unfair methods of
> competition for the purposes of § 480-2, and therefore
> a plaintiff with standing need not prove that conduct
> which violates HRS § 481B constitutes an unfair method
> of competition.  See id.  However, by so doing, the
> legislature did not determine that an injury suffered
> by "any person" as a result of a violation of chapter
> 481B necessarily stems from the negative effect on
> competition caused by the violation.  In other words,
> the legislature was not making a determination that any
> person injured as a result of a violation of Chapter
> 481B automatically has standing to sue pursuant to HRS
> § 480-2 and 480-13.  Instead, a private person must
> separately allege the nature of the competition in
> accordance with this court's holding in HMA.

Davis, 122 Hawai'i at 440, 228 P.3d at 321.  It is this

requirement that Defendants allege Plaintiffs fail.  The Court

agrees.

     Plaintiffs argue that they are not required to allege

an antitrust injury as defined by federal law.  This argument

suffers from a number of flaws.

     First, Hawaii's requirement that a plaintiff assert the

nature of the competition is designed to serve the same purpose

as the federal requirement that a plaintiff assert an antitrust

injury.  As the Davis Court explained:

> Hawaii's requirement that a plaintiff allege the
> "nature of the competition" in his or her complaint in
> order to maintain an action for unfair methods of
> competition pursuant to H.R.S. § 480-2(e) is consistent
> with the federal requirement that a plaintiff allege
> that his or her injury "reflect[s] the anticompetitive
> effect either of the violation or of the
> anticompetitive acts made possible by the violation,"
> in order to have standing pursuant to section 4 of the
> Clayton Act.  Furthermore, this requirement reflects
> the underlying purpose of both the federal and Hawaii
> antitrust laws, which is to preserve unrestrained
> competition.

Davis, 122 Hawai'i at 446, 228 P.3d at 326 (citations omitted).

The Hawaii Supreme Court further noted in Davis that to bring a

claim under H.R.S. § 480-13(a), a party must show "two distinct

elements:" (1) resulting injury to business or property and (2)

damages.  Davis, 122 Hawai'i at 439, 228 P. 3d at 319 (citing

Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Trans. Co., Inc.,

91 Hawai'i 224, 254 n.31, 982 P.2d 853, 883 n.31 (1999)).  The

Davis court also quoted the Robert's Hawaii court's explanation

that

> Indeed, federal case law has interpreted the "injury to
> business or property" language of section 4 of the
> Clayton Act as a causation requirement, requiring a
> showing of "antitrust injury." "Plaintiffs must prove .
> . . [an] injury of the type the antitrust laws were
> intended to prevent[, one] . . . that flows from that
> which makes defendants' acts unlawful. The injury
> should reflect the anticompetitive effect either of the
> violation or of anticompetitive acts made possible by
> the violation.  It should, in short, be the 'type of
> loss' that the claimed violations . . . would be likely
> to cause.

Id.  After discussing the aforementioned language, the Davis

court specifically held that "although the deeming language of
H.R.S. § 481B-4 eliminates the requirement that a plaintiff prove
that a defendant's conduct that violations chapter 481B
(including H.R.S. § 481B-14) constitutes an unfair method of
competition, it does not purport to modify the causation
requirement of H.R.S. § 480-13."[12/]   Id.

Thus, although, Plaintiffs assert that Defendants'
reliance on Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477
(1977) is misplaced, the Court finds that it is relevant and
appropriate.  The Hawai'i Supreme Court examined Brunswick in

_____

    [12/] The Davis court also explicitly rejected the dissent's
argument that
        because the legislative history indicates that HRS §
        481B-14 was intended to prevent harm to employees, it
        can therefore be inferred that the legislature did not
        intend to require that a plaintiff plead the nature of
        the competition in order to bring an unfair methods of
        competition claim under HRS § 480-2(e).  Dissenting
        Opinion at 457-58, 228 P.3d at 337-38.  However, as we
        discuss above in section II-B-2, the legislative
        history of HRS § 481B-14 indicates that both employees
        and consumers may be negatively impacted when a hotel
        or restaurant withholds a service charge without
        disclosing to consumers that it is doing so.  Moreover,
        the legislature chose to place HRS § 481B-14 within
        Hawaii's consumer protection statutes and provided that
        it be enforced through HRS § 480-13.  Therefore, while
        the legislative history of HRS § 481B-14 recognizes
        that employees are negatively impacted when a hotel or
        restaurant does not properly distribute the service
        charge, neither this recognition nor anything else in
        the legislative history of HRS §§§ 481B-14, 481B-4, or
        480-2(e) indicate that the legislature intended to
        eliminate the causation requirements of HRS § 480-13
        for unfair methods of competition claims brought under
        HRS § 480-2(e).
Davis, 122 Hawai'i at 440, 228 P.3d at 320.

Davis and has also previously quoted it with approval.  The Davis Court explained, "in Robert's Hawaii, this Court further noted that the antitrust injury 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'"  Davis, 122 Hawai'i at 443, 228 P.3d at 323 (quoting Robert's Hawaii, 91 Hawai'i at 254 n.31, 982 P.2d at 883 n.31 (quoting Brunswick, 429 U.S. at 489)).

Moreover, Plaintiffs' argument is undercut by Plaintiffs' own reliance on numerous federal cases assessing whether a plaintiff had adequately pled antitrust injury through the "inextricably intertwined" analysis.  See Plaintiffs' Opposition at 17-22; see e.g., Blue Shield of Virgina v. McCready, 457 U.S. 465, 471-72 (1982)(affirming the Circuit Court, which had recognized that the goal of the alleged conspiracy was the exclusion of clinical psychologists from a segment of the psychotherapy market, and which had concluded that the remedy in § 4 of the Clayton Act was available to any person whose property loss is directly or proximately caused by violation of the antitrust laws and that the plaintiffs' loss was not too remote or too indirect to be covered by the Act); Ostrofe v. H.S. Crocker Co., Inc., 740 F.2d 739, 742-43 (9th Cir 1984) (examining the plaintiff's alleged injury and concluding that the plaintiff had standing because, inter alia, the plaintiff's injury was "of the type the antitrust laws were intended to

prevent and that flows from that which makes the defendants'
actions unlawful" (citing <u>Brunswick Corp. v. Pueblo Bowl-O-Mat</u>,
429 U.S. 477 (1977))).

Here, the Court finds Plaintiffs' allegations do not
show the nature of the competition or demonstrate that Plaintiffs
have suffered an antitrust injury.  Their allegations fall far
short of the type of allegations that were found sufficient in
<u>HMA</u>.

### 1.   The Allegations in Paragraph 14

First, in paragraph 14, Plaintiffs assert that "the
defendants have gained an unfair competitive advantage over
competitor hotels that comply with Section 481B-14 because the
defendants are able to reduce the published cost of their food
and beverages by improperly profiting from the imposition of a
service charge that their customers would believe is used in full
to pay gratuity for their food and beverage service employees."
Second Am. Compl. ¶ 14.  The Court finds that, under the <u>Twombly</u>
and <u>Iqbal</u> standard, this allegation does not state a claim that
is plausible on its face.  Defendants argue that Plaintiffs have
failed to allege any facts regarding any specific actions taken
by Defendants regarding their pricing.  Motion at 18.  Plaintiffs
in opposition assert that "Plaintiffs have not alleged that this
might have happened, but that it did."  Opposition at 22 n.8.  In
support of this assertion, Plaintiffs cite to their allegation in

55

paragraph 14 quoted above, emphasizing that "the defendants <u>have</u> <u>gained</u> an unfair competitive advantage . . . ." <u>Id.</u> (emphasis in original).  The Court is not persuaded that alleging "the defendants have gained an unfair competitive advantage" because they "are able to reduce the published cost of their food and beverages" is the same as actually asserting that the Defendants did in fact lower their food and beverage costs.  However, even construing the Second Amended Complaint liberally in favor of Plaintiffs and interpreting the above language to constitute an allegation that Defendants did reduce the published costs of their food and beverages, such an allegation is insufficient.

As Plaintiffs correctly argue, they are not required to prove predatory pricing in order to prove an unfair method of competition.  <u>See</u> Opposition at 11, 14-15.  However, Plaintiffs are required to show that Defendants' conduct will negatively affect competition in order to recover on an unfair methods of competition claim.  <u>Davis</u>, 122 Hawaiʻi at 438, 228 P.3d at 318. It is not enough to allege harm to a competitor (e.g. that Defendants have gained a competitive advantage over hotels and restaurants which do make the disclosures or remit the entire service charge to their food and beverage servers), Plaintiffs must allege a harm to competition.  <u>See</u> <u>Brunswick</u>, 429 U.S. at 488 (explaining the antitrust laws were enacted for the protection of competition not competitors).  Therefore, if the

only effect on competition that Plaintiffs allege is lower
prices, they must show that those lower prices are predatory.  As
Defendants argue, lower prices, so long as they are not
predatory, actually benefit competition, as opposed to harming
it.[13/]  See Reply at 4 (citing <u>Matsushita Elec. Indus. Co. v.</u>
<u>Zenith Radio Corp.</u>, 475 U.S. 574, 594 (1986) ("[C]utting prices
in order to increase business is the very essence of
competition.")); <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495
U.S. 328 340 (1990) ("ARCO") ("Low prices benefit consumers
regardless of how they are set, and so long as they are above
predatory levels, they do not threaten competition.  Hence, they
cannot give rise to antitrust injury.")).

        Comparing Plaintiffs' allegations in Paragraph 14 with
the allegations in <u>HMA</u> demonstrates their insufficiency.  In <u>HMA</u>,
the Plaintiffs alleged that the defendant's conduct had adversely
impacted, and continued to adversely impact, members of
defendants' health plans because it had imposed financial
hardships on plaintiffs and in some cases threatened the

---

[13/]  In their Opposition, Plaintiffs "recognize that Judge
Gillmor seems to indicate in her Order in <u>Davis</u> that a plaintiff
may need to prove that a defendant lowered prices to predatory
levels in order to show an 'injury to competition' [to] prove a
violation of HRS § 481B-14."  Opposition at 14 n.5.  Plaintiffs,
however, "[r]espectfully . . . disagree with this holding."  <u>Id.</u>
As discussed above, Plaintiffs' objection fails because they are
required to show some negative effect on competition.
Accordingly, where the only effect on competition is lower
prices, such lower prices must be predatory in order to result in
an antitrust injury.

continued viability of the medical practices run by the plaintiffs, required plaintiffs to expend more resources that would otherwise have been available to provide enhanced healthcare services to the defendant's plan members, made it more costly and difficult to provide the same quality of care, and increased the cost of rendering healthcare services. <u>Davis</u>, 122 Hawai'i at 436 n.24, 228 P.3d at 316 n.24 (citing <u>HMA</u>, 113 Hawai'i at 112, 148 P.3d at 1214). In addition, in <u>HMA</u>, the plaintiffs alleged that the defendant dominated the enrollee market, was the largest provider of fee-for-service insurance in the state with over 90% of the market and that over 90% of physicians participated with defendant. <u>Id.</u> Thus, in <u>HMA</u>, the plaintiffs had clearly specified the market, as well as a harm to the market and competition in the form of increased prices because of the defendant's behavior.

There are no comparable allegations here. Accordingly, the Court finds that the allegations in Paragraph 14 are insufficient to allege the nature of the competition as required by the court in <u>Davis</u>. Stated another way, Plaintiffs have failed to show an antitrust injury because they have not shown the necessary causation between the alleged violation of the antitrust laws and their alleged injuries.

2.  <u>The Allegations of Paragraph 15</u>

Next, in paragraph 15, Plaintiffs assert that the

58

Defendants' "failure to remit the entire service charge to their employees or to disclose to their customers that the service charge[] is not remitted in full to their employees as tip income also provides the defendants with an unfair competitive advantage over the plaintiff employees who are competing with the defendants for the money customers are willing to pay for the food and beverage services provided."  Second Am. Compl. ¶ 15. In the 9/30/10 <u>Davis</u> Order, the court rejected this allegation, finding that the equivalent paragraph of the Second Amended Complaint in that case failed to adequately plead the nature of the competition.  9/30/10 <u>Davis</u> Order at 29-32.  The court explained

> No caselaw or other authority has been produced to support Plaintiffs' allegation that they were "competiting" with their own employer for tips, that there is a competitive "market" for tips, or that the Defendants are part of this market, such that the Defendants' conduct could have had a negative effect on competition in such a market.

<u>Id.</u> at 31.  Plaintiffs have not provided this Court with any reason to depart from the 9/30/10 <u>Davis</u> Order's holding. Plaintiffs only briefly reference this argument in their Opposition (at note 6), but as noted by Defendants in their Reply, Plaintiffs do not address Defendants' argument on this point in their Opposition.  <u>See</u> Reply at 6 ("Plaintiffs apparently concede that they fail to plead antitrust injury in Paragraph 15, having chosen not to respond to this argument.").

Accordingly, this Court finds that Paragraph 15 is insufficient to allege the nature of the competition required to state a UMOC claim.

### 3.   The Allegations of Paragraph 16

Finally, in Paragraph 16, Plaintiffs allege that the "injuries of the plaintiff employees flow directly from the defendants' anti-competitive acts and are inextricably intertwined with the defendants' anti-competitive acts." Second Am. Compl. ¶ 16.  For this proposition, Plaintiffs rely on a line of cases flowing from the United States Supreme Court's decision in Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982).  See Opposition at 17.  In their Reply, Defendants argue that the "'inextricably intertwined' standard is not a magic wand that transforms an injury in fact into an antitrust agreement." Reply at 6.  Defendants further argue that all of the cases that Plaintiffs have cited in support of their "inextricably intertwined" argument are distinguishable because harm to competition was clearly present.  Reply at 8.  The Court agrees.

Paragraph 16 essentially does not raise any new allegations.  It merely takes the allegations of Paragraph 14 and asserts that Plaintiffs' injury is inextricably intertwined with Defendants' allegedly anticompetitive conduct.  This is insufficient.  As Judge Gillmor explained, "Plaintiffs must first prove that an injury exists that the Defendant[s] 'sought to

60

inflict' on competitors, before Plaintiffs can establish that
their injury is inextricably intertwined with this injury."
9/30/10 <u>Davis</u> Order at 34 (citing <u>Blue Shield</u>, 457 U.S. at 484).
In contrast to this case, as Defendants aptly explain, in <u>Blue</u>
<u>Shield</u> harm to competition was alleged because the plaintiff
alleged that Blue Shield's practice of reimbursing subscribers
for psychotherapy provided by psychiatrists, but not
psychologists, was anticompetitive because it limited
subscribers' access to psychotherapy services, thereby
suppressing competition in that market.  Reply at 7; <u>see also</u>
<u>Blue Shield</u>, 457 U.S. at 468-472.  Similarly, in <u>American Ad.</u>
<u>Mgmt.</u>, the Ninth Circuit found an antitrust injury where the
defendants' conduct resulted in higher prices to consumers.  <u>See</u>
Reply at 8; <u>American Ad Mgmt., Inc. v. General Telephone Co. of</u>
<u>California</u>, 190 F.3d 1051, 1056 ("Any intent by GTE to eliminate
discounting is equivalent to an intent to harm competition by
increasing prices").  Likewise, in <u>Glen Holly</u>, the Ninth Circuit
held that a plaintiff had alleged antitrust injury, finding that
"the [defendants'] agreement detrimentally changed the market
make-up and limited consumers' choice to one source of output."
<u>Glen Holly Entm't, In. v. Tektronix, Inc.</u>, 343 F.3d 1000, 1010-11
(9th Cir 2003).  The Ninth Circuit further explained that "[o]ne
form of antitrust injury is 'coercive activity that prevents its
victims from making free choices between market alternatives.'"

Id. (citation omitted).

As discussed above, Plaintiffs have not alleged any harm to competition and Plaintiffs' conclusory statements that their injuries are inextricably intertwined with Defendants' anti-competitive acts does not satisfy the requirement that Plaintiffs show there is some negative affect on competition caused by Defendants' behavior.[14]

4. Conclusion Regarding UMOC Claim (Count I)

Accordingly, as none of the paragraphs added by Plaintiffs adequately alleges the nature of the competition, the Court grants Defendants' Motion to Dismiss Plaintiffs Unfair Methods of Competition Claim (Count I).

**III. Whether Plaintiffs Fail to Adequately Allege a Claim Against Certain Defendants**

Defendants argue that all of Plaintiffs' theories of relief are predicated upon the existence of an employer-employee relationship between food and beverage servers and each of the Defendants.  Motion at 9.  Defendants further argue that although Plaintiffs have named KSL Grand Wailea Resort, Inc., MSR Resort

_____

[14] The Court recognizes that although the 9/30/10 Davis Order indicated that "[t]here is no explanation in Plaintiffs' Second Amended Complaint as to how using money from service charges to lower published food and beverage prices has any effect on the market that is economically plausible under Twombly" the court there nonetheless allowed certain of plaintiffs' claims to proceed.  See 9/30/10 Davis Order at 33-34. This Court respectfully disagrees and finds that as a result of the lack of plausibility, Count I must be dismissed in its entirety.

Lodging Tenant, LLC, CNL Resort Lodging Tenant Corp., and CNL Grand Wailea Resort, L.P. (collectively, the "KSL/MSR/CNL Defendants") as defendants, the Second Amended Complaint fails to state any facts establishing an employer-employee relationship between Plaintiffs and these defendants. Id. at 10.  Defendants further elaborate that Plaintiffs allege the KSL/MSR/CNL Defendants owned the Hotel at various points, but do not allege any facts regarding any employment of Plaintiffs by the KSL/MSR/CNL Defendants, any control exerted by the KSL/MSR/CNL Defendants over the Plaintiffs' terms and conditions of employment with any other entity, or the existence of any other relationship between Plaintiffs and the KSL/MSR/CNL Defendants. Therefore, Defendants argue that Plaintiffs' claims against these Defendants amount to nothing more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Iqbal, 129 S. Ct. at 149).

Plaintiffs respond to this argument in a footnote, asserting that it is meritless. See Opposition at 8 n.1. Plaintiffs assert that Plaintiffs' Second Amended Complaint clearly alleges that Plaintiffs were employees of the Defendants and that Defendants "managed" the Hotel at which the Plaintiffs worked at different times during the statute of limitations. Id. (citing the Second Am. Comp. ¶¶ 1-8).

Defendants' Reply asserts that Plaintiffs' singular

allegation that the KSL/CNL/MSR Defendants "managed" the hotel does not establish that the employed Plaintiffs.  Reply at 1.

Because on a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, the Court must deny Defendants' Motion to Dismiss the KSL/CNL/MSR Defendants.  See Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996).  Plaintiffs have alleged that they were employees of the Defendants.  See Second Am. Compl. at ¶ 4.  Defendants are, of course, free to bring a motion for summary judgment in the future arguing that the KSL/CNL/MSR Defendants never employed Plaintiffs.

**CONCLUSION**

Defendants' Motion to Dismiss is granted in part and denied in part.  The Court DENIES Defendants' Motion to DISMISS Counts I, II, IV, and V on the grounds that they are preempted by federal labor law.  The Court GRANTS Defendants' Motion to Dismiss Count III, in so far as it alleges a breach of an implied contract between Plaintiffs and Defendants, which is preempted by Section 301.  The Court DENIES Defendants' Motion to Dismiss as to the remainder of Count III, as it is not preempted.  The Court GRANTS Defendants' Motion to Dismiss Count I (Plaintiffs' Unfair Methods of Competition Claim) on the basis that Plaintiffs have failed to state a claim as required by Rule 12(b)(6).  The Court

finds that the Plaintiffs have failed to adequately allege the nature of the competition as required by the Hawai'i Supreme Court in <u>Davis</u>.   Accordingly, Count I is dismissed without prejudice and with leave to replead, in the event Plaintiffs believe that they can allege sufficient facts as required by <u>Davis</u> and this order.   The Court DENIES Defendants' Motion to Dismiss the KSL/CNL/MSR Defendants.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, December 10, 2010.



_____
Alan C. Kay
Sr. United States District Judge

<u>Wadsworth v. KSL Grand Wailea Resort, Inc.</u>, Civ. No. 08-00527 ACK-LEK: Order Granting in Part and Denying in Part Defendants' Motion to Dismiss